The fourth and final case of the day, which is Wade v. Georgia Correctional Health, 21-14275. We've got Ms. Brady here for the appellant, Ms. Jones and Mr. Hennefeld here for the appellees. Yeah. Good morning, your honors, and may it please the court. David Henninger had a serious seizure disorder that was controlled with daily medication. Each defendant's job was to make sure he got that medication every day. But the record of summary judgment shows that in 2016, this group of defendants repeatedly ignored his requests for his medication. And as a result, he went four straight days without it. He then suffered seizures so severe that they caused permanent brain damage. So can I—I want to try to focus this as much as possible in the limited time we have. So as I understand the primary or major argument of the officers, it's that I was not actually aware of the harm that this would have caused. In other words, I subjectively knew the facts, but I wasn't actually aware that this would cause harm. The nurses sort of have the mirror side of that, which is I obviously know that not getting your seizure medication can cause harm, but I was not subjectively aware of the facts. Do you agree that that's really what we're talking about for the most part? I would push back on the first argument as to the defendant officers, your honor, and that's because they didn't raise that argument in the trial court at summary judgment. To the extent they're arguing now in their briefs that they were unaware of the risk of a four-day deprivation. Okay. That's a brand new argument. Let's put waiver aside. You agree that they raised that on brief here, correct? Yes, Judge. Okay. Then let's break it up. So we'll start with each one. So let's talk about Lieutenant Stroh. I might get the name wrong. What evidence do you have that he was subjectively aware that not getting the medication would cause harm in this case? Your honor, he testified at his deposition that he was aware that more than a here and there deprivation of seizure medicine could cause—could lead to serious health consequences. I have his deposition right here, or at least part of it. So I'm looking at CMECF pages 165 and 166. Here's the testimony I'm referring to. Do you not think that it was serious? Not of what happened here. Answer, as I said, I have a son with seizure disorders, and he has missed doses from time to time, and no, I was not alarmed. Question, okay, so it's your testimony today that because you have a child with a seizure disorder, and it was okay for him to miss doses of the medicine, anti-seizure medicine, that you thought it was okay for Mr. Henniger to miss doses of that medication too? Answer, no. Question, okay, can you clarify then what you just then said? Answer, that's why there was not a sense of urgency. I'm not saying he shouldn't have went without his medication. That's not the case.  Isn't that pretty clear testimony, that whether right or wrong, he subjectively believed that the four days he went without it was not urgent? No, Your Honor. So Defendant Stroh testified that his son with a seizure disorder, it was okay for him to go from time to time without medication. But by the time David Henniger went to pill call on the fourth day, Defendant Stroh knew that he had been repeatedly without doses, and that that was not a from-time-to-time situation. I know, but he's saying, he's asked about the very thing that happened here. In other words, the four days, did that create the urgency for you? And he says no. Is there anything to contradict that in his deposition or elsewhere? He testifies, Your Honor, that five days could potentially cause a serious health problem. But not four. Seven days definitely does. And I think that a jury could look at that testimony and conclude that it wasn't reasonable for him to distinguish between four and five days. The point is that he knew that continued consecutive deprivations could lead to serious health consequences. Okay. So let's talk about the second officer, Keith. Officer Keith, thank you so much. Sergeant Keith. So I tend to agree with you, I'll just set that out there, that there's at least an inference that he did subjectively aware, he was subjectively aware. He testified that it was concerning. He said that's not a medication you want to miss or something like that. And he went out of his way to talk to the nurse. He did. I know you want to hold that both ways, but you can't. I'm sorry. You can't have that both ways. So now, with that, though, that puts you into the other problem, which is what did he do and was it more than, we'll get to this, but the gross negligence, non-gross negligence thing. If he did checkmark on the thing, on the MARs, and believe, and he did believe that that was how you communicated with the medical department, if he then sought out the nurse and told the nurse, a nurse, that this happened, although he did not go to the next step that he should have, how can we say that's doing, A, doing nothing, and B, more than gross negligence? To Your Honor's first point, I don't believe the court is required to believe Defendant Keith that he told a nurse. There is contradictory testimony, and that's something that a jury needs to sort out. I know, but they can't make both. A jury cannot be told. You would never argue to a jury both inferences. So if we're the jury, you'd have to pick one, and it seems to me that you picked he was told because that helps you, we'll get to there, but that's going to help you down the line. And I get why you've made that choice, but you can't have it both ways. I don't know the case that's the case, and even if we're under the fantasy that we're the jury in deciding this, that no reasonable jury can decide, you could never argue to a reasonable jury that this, in fact, happened and it did not happen. Respectfully, Your Honor, I disagree. A plaintiff isn't, and I'm not saying we would do this at trial. Let me put it this way. Assume with me I disagree with you and that that fact is established. How can he be grossly negligent? So Defendant Keith told, if this is true, Defendant Keith told a nurse on day one. Defendant Keith then learned that four days later, David Henniger had still gone three more consecutive days without his medication, and rather than calling the on-call doctor like he was supposed to, he just put another question mark in the medication record and said, go talk to a nurse in the morning. So he made an active decision that it was okay for David to go without his medication for more time. He knew that this system of communicating with the nursing staff wasn't having the effect of getting David his medication. He learned that because there was three more consecutive days of missed doses. And so his decision to just put a question mark in the record and send David on his way, that is akin to doing nothing. And it was persisting in an ineffective course of treatment that is also deliberate or could be deliberately indifferent. I just have a hard time understanding how that's beyond gross negligence. In other words, knowing and having objectively aware and doing nothing. When he knew about the medication, he made what he thought was the check marks. He specifically told the nurse to follow up. And then when he saw, he didn't just say, ha, ha, ha, you didn't get your medication. He said, hey, listen, go see them in the morning so that we can take care of this. Of course, tragically, we know what happened. But that just doesn't seem to be the nothing. It seems to be bad and wrong and not what I would want if I was in this situation or anybody should want. But not to the criminally reckless point that Farmer tells us is required. Well, Your Honor, recklessness is defined in criminal law as a conscious disregard for a known risk. That's exactly what defendant Keith did, is he was aware. And as Your Honor noted, he knew that it was risky and that he knew that it was more risky on day four than it was on day one. It's the disregard part that I think is what I'm having trouble with. But we're running out of time, and I want to get to the nurses. So as I understand it, though, is there any testimony that the nurses did anything? No, Your Honor. Their whole claim is, I just didn't know this was going on, right? Yes, Your Honor. So if we believe that there is record evidence that they did have subjective knowledge of the facts, in other words, that they should have reviewed or would have seen the MAR or the post-it note, or that when doing the inventory cart that was there, there's nothing else to point to that that's enough, right? There's nothing else to point to that they did anything with that knowledge. That's correct, Your Honor. There was the supply of Dilantin right there in the prison. Okay. So assume for the moment I agree with you that in my view, in the most favor, the nurses had the subjective knowledge of the facts that it was out with regard to Ms. Stranager. Show me where, give me your best broad principle, not an unpublished case, your best broad principle on point that would allow us to overcome qualified immunity. Your Honor, this Court's opinion in Sparks v. Engel came down in 2018. And that case held that it was clearly established. You said 2018? 2018. Isn't that problematic? No, Your Honor. That case held that it was clearly established in 2013, which was three years before the incidents in this case, that prison officials must provide seizure medication to epileptic patients. Just so I'm clear, is Sparks published? No, that's the unpublished. It's unpublished. You may not know, but unpublished decisions cannot, as a matter of law, clearly establish law. Your Honor, we're not relying on Sparks as the source of what clearly establishes the right. It couldn't because it post-stated the incidents in this case. Okay. But what Sparks says is there's a long list of published law going back to 1976. Give me the published law that establishes the broad principle that you want to be able to do. Not Sparks, but the published opinion it relies on. Give me that broad principle. Sure. So Sparks relies on cases that say it's unconstitutional to ignore a doctor's orders, which a prescription is. Give me word for word what the cases say. Because remember what the concept of this is, that an official knows the law and is disregarding that clearly established law. So they have to actually know what's in writing. So tell me literally word for word, not what you glean or not what you think, even though I'm certain it's brilliant, but what the actual case says. Sure. So Sparks relies on the cases Estelle v. Gamble. Okay. And what does Estelle say? I mean, Estelle's old and a broad case. What does it say? Yeah, Estelle establishes the broad principle that it is unconstitutional to ignore prisoner requests for medical attention. So that's the big, the broad principle. That's that second prong of the second way of establishing. Do you have word for word what part of Estelle says? Your Honor, Sparks cites Estelle at pages 104 through 105. I don't have the exact text in front of me. Do me a favor, when you come up in rebuttal, please. The issue I'm struggling with is I'm trying to look at what broad principle there is. And a lot of them talk about intentional refusals and where there's serious and painful, where there's obvious serious and painful injuries, meaning something that's patent right there, not latent. So what I want to do is look at the exact thing that would put every reasonable official on notice that what was done here was unconstitutional. Sure, so I can provide the exact language, but I will say that Sparks relies on the case of Estelle v. Gamble, Goebert. So, okay, let's take Goebert. I've looked at all the cases that Sparks relies on, so Goebert. Goebert is actually quite clear that, quote, the cases, and this is in the clearly established section, quote, the cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of the official's acts and omissions. So Goebert tells us that these are difficult cases to have broadly established principles. So I don't think Goebert helps. So point me to where. Show me the way. Sure. So this Court addressed that question. This Court has already chosen to rely on Goebert as a source of clearly established law. So to the fact, to your Honor's point, that it's a fact-intensive inquiry, the principle still applies. And in this case, the facts are materially similar to the facts in Sparks, which relies on decades of precedent that inmates are entitled to their prescriptions, that doctors, prison officials can't ignore inmate requests for medication. Prison officials can't do basically nothing when it comes to providing medication in the face of a known serious health need. And so while I don't have the specific language in front of me, those principles are clearly established. And this Court has found that that collection of principles is enough to put officials on notice that they need to give epileptic patients their Dilantin when there's a risk without it. Okay. Very well. You've got your full rebuttal time remaining. Thank you, Your Honor. All right. Ms. Jones, are you up first? All right. Oh, Lonas, I'm so sorry. That's all right. It happens to me all the time. Yikes. Good morning, Your Honors. Good morning. I represent Officers Stroh and Keith and Nurses Lee and Harrell in this appeal. Counsel, so I'm just going to tell you from my perspective. Okay. I think the most difficult issue for you is the nurses, Nurses Harrell and Lee. I agree. And I'll tell you where I'm coming from. Okay. It seems to me that it's a reasonable inference for a jury that Sergeant Keith did tell a nurse and that that nurse was Nurse Lee. Now, I know you dispute the last part, but the timeline as I understand it is the pill call would have been on August 28th at 9 a.m. I'm sorry, 9 p.m., and the only nurse that was really working from starting from, I think, 4 a.m. and overlap for about an hour, meaning it's very plausible that someone on the way out said, hey, this happened at the 9 a.m. pill call that was Nurse Lee. Now, I know you say that there are other nurses that this could have been, and certainly that's possible. But when we're talking about reasonable inferences, it seems to be that that's a reasonable inference. So that's number one. And then with regard to Nurse Harrell, it seems to me the testimony is, A, that while Nurse Melton was gone, she was doing the inventory, B, that the inventory happened at some period of time during this, and C, from Nurse McDade, the testimony is that the inventory would have included matching MARs with what was in the pills, and so one would have seen that it was there. And so I'm having, I'm not saying this happened. I'm not saying that anything, that their testimony isn't 100 percent accurate. I'm just saying that at summary judgment, it seems that there would be evidence to suggest that they subjectively knew, and that's really their only defense on the constitutional violation. Now, I think you have the better argument on the clearly established part. So that's where I am, and I just want to lay that out for you. Okay, and I appreciate knowing where you're coming from there. Maybe that can help me focus my argument. And I do understand what you're talking about. It might have been Nurse Lee who was told about this. I will point, whatever nurse that was told, and there's evidence that both David Henniger and Sergeant Keefe told a nurse, and it may not have been the same one, but there's evidence that they told a nurse. And for both of them, the testimony is that the nurse said, it's on order. And I would say to you there that what that is telling us, at least to some degree, is that that nurse looked into it. It may have been just momentarily. Maybe they just flipped to a piece of paper, but there's some knowledge on that nurse's part that the medicine has been ordered and, therefore, it is on its way, and, sir, we're helping you with your problem. But that's not perfect. So are you making, I agree with you, are you making a gross negligence argument? Yes. Because I had thought the argument you made in your brief was the knowledge argument. And that's certainly a big part of it, too. But I think that, I mean, you can affirm on any ground. Agreed. By the record. That is supported by the record. And I think that that's also part of it. And we have pointed out that they are not correct, that it's not mere negligence, that it is beyond gross negligence, that it has to show something along the lines of criminal recklessness, and that the record here does not support that. Do you agree, I guess, at least, that there is a divergence in our case law about this? And, I mean, this is, in a way, it's sort of like part of your argument about clearly established law. It is part of our argument about this. But, I guess, first, do you agree that it's not just a lay down hand that it's gross negligence? It could possibly, the standard could possibly be mere negligence. I think in light of, and this isn't in our brief because it only happened a month ago today, but the Ireland v. Promell case that came out November 14th, I think it makes it absolutely clear in footnote 5 that the standard is beyond gross negligence. Well, I mean, look, I've written about this as well. I've got my own, like, series of footnotes and cases. You probably, you know, you've read them where, to me, it seems like we've got this sort of fatal disconnect in our precedent. And, you know, arguably, sort of the tiebreaker or the resolver is farmer itself, which refers to, you know, recklessness as described in the criminal law. But, you know, what do we do with this separate line of our cases post-farmer that seems to say mere negligence? And I think, frankly, I mean, it could be. I could be wrong about this. But if we're looking for the first in time case, which, of course, is our precedent about precedent, then I think the case is probably this case called Adams v. Poag that, like, no one's ever pointed to. And it refers to mere negligence. So what do we do with all that? Well, I think with all due respect to the authority of this Court that farmer, being from the Supreme Court, is the ultimate source. And farmer is pretty clear. And the footnote that I referenced in the Ireland case makes clear that farmer applies to criminal recklessness. It's very clear that it has to be beyond mere gross negligence. So I think, you know, whatever this Court has said, the Supreme Court is the ultimate authority. And so the cases post-farmer in which we've said mere negligence are just wrongly decided, I guess? Including the first in time case in Poag? Perhaps. And I think, you know, I think there's also a conclusion that perhaps it could be made that Poag makes the statement about mere negligence. But as the case law has gone on, the standard has been refined. Of course, that argument I frankly just don't think works. For better or worse, we have this precedent about precedent that says when there is a divergence, we look to the first in time case. So if the first in time case is Poag and it says mere negligence, then at the circuit level, maybe we're kind of stuck with that. Now, your argument might be, well, that is just irreconcilable with farmer itself. And I think that's fair, that it is irreconcilable with farmer if it sets a lower standard than farmer set. So let me ask you this. And I just find this issue fascinating, and I think it might matter in this case. So your argument about sort of the law couldn't possibly have been clearly established because there's this sort of fatal disconnect in the precedent. And, in fact, what's weird, there's like this meta disconnect because not only is there a disconnect as to whether it's mere or gross, there's this further disconnect about like a disagreement about which case is it that like was the first in time case, and then a further disconnect that neither of those two things point to Poag. And so I take your point that there's this uncertainty on top of uncertainty about what the standard is and if that's the world we're living in, how could the law possibly have been clearly established? Their response, which has some intuitive appeal, is if that's what qualified immunity means, then it has ceased to have any connection to the real world anymore at all because the likelihood that any public official is grinding over the distinctions, the fine gradations between mere and gross negligence when deciding how to conform his or her conduct is zero. Zero. It's just like a complete fiction. So what's your response to that? Well, my response to that is I understand where they're coming from intellectually. I mean, qualified immunity for many purposes has always been a bit of a legal fiction anyway, and that analysis that you just put forward doesn't change that. You know, that may be an argument to get rid of qualified immunity, but that's not what we're here for today because we stand here now and certainly as these people stood in the prison in 2016, qualified immunity existed, and we've got to apply it as best we can. Okay. Very well. If there's this disconnect, is the answer that, in other words, if the argument is we didn't know the contours of what this was, is the answer that at the very least Farmer and Estelle, which are clear, dictated the contours? Well, I mean, Estelle is a pretty generalized case, but it certainly begins to set those contours. It is, but it establishes the right to medical care in prison, and then Farmer comes along and says here's what we meant by deliberate indifference, right? Yeah. I mean, Estelle establishes the general right, and then Farmer says here's the hurdle. Right. But we're talking about the elements of what makes up deliberate indifference, what makes up that claim. You know what the elements are, at least after Farmer, even if there's some clarity about this whole negligence stuff a little bit below the line. Is that correct? I think that's fair. Okay. But still, this Court has said it was referenced earlier to Baby the Plague case. There's also the Gaumans v. Gagnon case where this Court has very much analogized Eighth Amendment medical cases to Fourth Amendment cases by saying they're very case specific. So looking at general concepts is not terribly helpful. Can I ask you a quick question just to follow up on the line of questioning that I was asking you earlier? And I have not looked at all the cases. I know we have deliberate indifference cases involving prisoners, like this case, Eighth Amendment cases, deliberate indifference cases involving pretrial detainees, Fourteenth Amendment cases. Does the standard, mere, gross, reckless, whatever, have we differentiated between prisoner cases and detainee cases? It's not clear to me on that. I mean, certainly the Court has suggested that a detainee is entitled to at least as much as a prisoner. In other words, we've left open that more or less could be required. Yes, if you've got somebody who has not yet been convicted of a crime, they may have more. I mean, the reason I ask, and this is not just like an academic abstraction to me, but if the amendment in play here is the Eighth Amendment, which prevents cruel and unusual punishment, then it sounds to me like the standard in an Eighth Amendment case, at least as a matter of first principles, perhaps ought to be more stringent than it is, or I guess I'm loading, but, you know, higher, than in the Fourteenth Amendment cases where the word punishment is just not part of the constitutional analysis. And that's what this Court has hinted at, although I don't think it's ever actually decided that issue. Supreme Court, too, has not actually decided it. That's my understanding. Okay. That's helpful. Okay. And I would say, and I would, you know, as this Court reminded us all in Hoffer a couple of years ago, there's a very wide difference between a constitutional claim and a tort. And so I asked the Court in closing to be mindful of that distinction, and we submit that the evidence here does not write to the level of a constitutional violation, even if perhaps there was some torts committed. Okay. Very well. Thank you so much, Ms. Lonis, and so sorry to have seen the L for a J. Mr. Hennefeld, you've got four minutes. Good morning. May it please the Court. McDade is sued as a supervisor here. A supervisor can be found liable if she personally participates in the constitutional violation or there's a causal connection between her actions and the alleged deprivation. McDade did not personally participate because she did not treat Henneger during the four days he went without medication. Plaintiff did not request any medical care from McDade during the four days. McDade didn't even see Henneger during the four days he went without medication. What, to your understanding, is the nature of the supervisor reliability claim? Is it a your policy is ineffective claim? Is it a you didn't have a policy claim? Is it that you had a custom of doing something that caused this? Is it you failed to train in a specific way? What is the nature of the claim? Well, I think David Henneger has argued all of those and unclearly exactly where he's going. Any kind of misapplication of a policy is not so widespread as to give McDade knowledge. Is there any evidence of this sort of thing happening before in the record? Absolutely not. There has never been another inmate who has failed to receive their medication. Even Mr. Henneger admits that except for these four days, the three years he was at Walker, he always got his medication. Does that leave them, I guess, then with an argument that the policy itself is on its face unconstitutional? No, Your Honor. There was policies in place. What was the policy? The policy was that McDade trained the officers to say if there's a medical, if there's a missing medication to tell the nurses. The officers thought they were communicating that by giving a question mark on the MAR. And in addition with an assumption that the nurses were looking at that MAR every day and they were only looking at it once a week. What was the policy regarding ordering medications where it had run out? A nurse ordered the medication, reviewed the MARs to see which ones would run out. This was Nurse Milton who's been dismissed. And before she went out on FMLA, she actually ordered this medication. And the pharmacy just failed to send it to the prison. I understand the facts. I'm asking what the policy is. The policy is that a nurse would review the medication orders, see which ones are about to run out, and then order the medications. And that was done during the inventory of the pill cart. The district court correctly determined that McDade is entitled to qualified immunity. Here, since there has been no pattern of this ever happening before, plaintiff has failed to carry her burden, his burden of showing that McDade is not available qualified immunity. Plaintiff cites four cases in the brief. Two were unpublished and cannot be used to establish qualified immunity. Goldberg, in that case, the pregnant detainee was not given the lay down pass during the day. The court actually upheld a summary judgment to the supervisor because he lacked actually knowledge because that sort of incident had never happened before. And plaintiff seems to be trying to point to broad general propositions, but clearly deliberate in different cases for failure to give medical care. This court has always said that it's very case specific in yeomans, in light of specific context of the case, not broad general propositions. Broad propositions will not do to overcome qualified immunity. Okay. Very well. I think we've got your case. Thank you so much. Thank you. All right, Ms. Brady, you've got your full four minutes of rebuttal remaining. So, counsel, before you begin, before the time clock starts, just two things. One is, if you can, so the argument was raised that something was done, because if you remember, the premise of my question was that the nurses did nothing. The response is they did something. They said that they were going to look into the orders. And then you can tell me whether that itself is more than gross negligence. And then secondly, it was the case that the broad principle. Yes, Your Honor. To the first question as to whether the nurses did anything. There was a supply of Dilantin in the prison medical cabinet. So doing something would have been going to the medical cabinet. But that just, that goes to whether it's negligence or whether it reaches the level or not. But pointing to something else they could have done doesn't mean that what they did was grossly negligent or was more than gross negligence, right?  Your Honor, there's a line of cases in this court that says that failure to do something effective in the face of a known ineffective course of action can constitute deliberate indifference. Well, at the point they were told, sorry, at the point they were told, though, checking in on it could have done something. In other words, if it was just a matter of it's been delivered, it's in the mail room and we can get it, something could have been done. Or calling the pharmacy, let's get it here on rush tomorrow. Like, that isn't necessarily ineffective. It may not be the best course of action. Again, it's not what I would have wanted. But that isn't a completely ineffective pounding my head against the wall sort of thing, is it? It's not doing nothing, which was all I was going to say. There's a doing nothing and a doing something that's ineffective. And it seems like once you're doing something that's in effective land, you are, in fact, in the standard land. I don't agree with that, Your Honor. There's cases in this court, like Benson v. Gordon, for instance, say that doing basically – Just so I'm clear, I think Benson is unpublished, correct? That's correct, Your Honor. But the principle in Benson is the same, is that it's unconstitutional to do basically nothing. So in that case of a prison nurse, I believe, left pain medication outside an inmate's cell and she knew that he couldn't get it. And so, you know, she technically did something. She brought him the medication, but the fact that he was unable to access it was the thing that made it potentially, deliberately indifferent a question for a jury. And I think, too, Your Honor's questions about this distinction between gross negligence and mere negligence and reckless disregard. I think this court has said it's often a distinction without a difference because it's a jury question. It goes directly to the defendant's state of mind. What did they know when they disregarded the risk? Did they know how serious it was for them to do so? And for a nurse, I think – So I just want to be clear. You agree it doesn't matter in this case? I think this court – the long line of footnotes say that it doesn't matter. Do you agree it doesn't matter in this case? I mean, I think there's also a line of cases, Adams v. Poag line of cases that has still been cited in recent opinions from this court that say that the standard is more than mere negligence. I know, but does it matter in this case? That's what I'm asking. No, Your Honor. It doesn't matter in this case. Okay. In other words, they were either merely negligent or grossly negligent. They were either one or both. They were either both or nothing at all. There's no world in which they were merely but not grossly negligent. I think that's right. I would need to think about it a little more, but I think for the purposes of this discussion, that is absolutely a jury question. These distinctions between minute levels of recklessness, of disregard, these go directly to the mental states of the defendants, and that's something a jury has to decide. So let me ask you this. So I asked your adversary the question about qualified immunity, clearly established law from your perspective, which frankly, again, I think has some real-world appeal. From their perspective, you know, I think she gave basically the right answer, which is not be a good reason to get rid of qualified immunity, but for the time being, we're stuck with it. And for better or worse, you know, the Supreme Court has said that qualified immunity has got to be sort of assessed at this relatively granular level. And so, you know, a reasonable officer, we have to engage in this fiction that a reasonable officer actually might have thought about sort of what are the fine gradations between mere and gross negligence, even post-farmer. Your Honor, I think that if any of these defendants were sitting around parsing whether – just how negligent they could be and deprive medication without committing a constitutional violation, that in and of itself is evidence that they were deliberately indifferent. We split those hairs, though, all the time in excessive force cases. I mean, we've said the difference between a hand movement or, you know, pointing it this way as opposed to that way makes all the difference in the world, even though the reality is that it would be hard-pressed for someone in that moment to think, oh, I can do it unconstitutionally if my hand is to the left, but it's unconstitutional if my hand is to the right. I just – I think once we're down this road, we're down this road. I have a hard time understanding why we would draw a line there. Your Honor, I think that in the excessive force context, those are split-second decisions versus the context like this where the defendants had four days to do something to get David his medication. And I think that Your Honor's point is correct, which is it's about evaluating actions, not understanding – not the defendants' understanding of these legal principles. They're not lawyers. They don't know what these principles are. But what they do know is that it is unconstitutional, that inmates have clearly established rights to seizure medication and other medications. All right. You can just answer my last question. All right. So hold on. Before we get there, can I ask one question about this? And then I do want Judge Luck to get an answer to his question. So I'll have to confess. Like when I read your brief and you said, look, we ought to be focusing on conduct and actions and not sort of the abstraction of the mental state, my first instinct was, you know what? That makes all the sense in the world. And then I sort of like rewinded the tape to like the first day of law school or something when you learn that in tort land or criminal law land, a wrongful action is the fusion of two things, an actus reus and a mens rea. And so unless we're willing to like write off mens rea as itself like a useless legal abstraction, then aren't they kind of right that you have to take account of the mental state required to make this action wrongful? Your Honor, I agree that mental state is a requirement. I think the place where we disagree with opposing counsel is that it's not their knowledge of whether – of what the word negligence means. It's their knowledge of whether the particular actions were unconstitutional. So this distinction between mere and gross negligence and that being a way to get them off the hook, that would effectively eliminate deliberation. So I'm not – I promise I'm not going to beat this horse all day long. But, I mean, I guess when you say the relevant question is whether they knew their actions were unconstitutional, not this ridiculous thing about mere versus gross negligence. For rightly or wrongly, post-Farmer, we have like said one of the ways by which you distinguish constitutional from unconstitutional action is whether something is insert the blank negligence, either mere or gross negligence. That's like part of the – it's incredible that when we're talking about parsing the language of the United States Constitution that we're sort of this far down the road. But, again, for better or worse, that's what constitutes the violation, whether it's mere or grossly negligent. I mean, I think that's a tool that judges and attorneys use to kind of help categorize levels of conduct or an instruction to a jury about how bad was this really. Was it super bad or was it a little bit bad, that kind of thing? But that inquiry is focused on judges and attorneys. It's not something that goes to the actors. The actors just need to know that if a prisoner has a need for a prescription life-saving medication, they have to give it to him. They have to make sure that he gets it. That's their job and that's their constitutional obligation. Okay, now, citation time.  All right, I'm ready, Your Honor. So, Sparks cites Estelle v. Gamble, which is a familiar – it just kind of lays out the deliberate indifference standard. I won't read that one. Sparks cites Goebert v. Lee County. All right, so I already quoted the issue with Goebert, though. Goebert was the one I said that it specifically says the cases, the ones that it's referring to, are highly fact-specific, involve an array of circumstances in terms of what's putting notice on a government official. I'm not sure Goebert helps you by the bottom line. What else? Sure. So, just to push back very briefly on that, this court already said that Goebert, requiring whatever factual similarity it does, puts officials on notice. Sparks cannot be the basis for you to make that argument to me because it's unpublished. But go ahead. Continue. Okay. So, Brown v. Hughes says – I'm sorry. What's the case? Brown v. Hughes. Okay. 894 F. 2nd. This is page 1538. It says, when prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference. The problem is the may is the problem there and the trier of fact. Imagine you're a police – you're a corrections officer and you're looking for that principle. It tells me exactly what to do. And when you say, well, it may do this, that doesn't tell every officer, every reasonable officer, is put on notice of exactly the conduct that would put them in hot water or not in hot water, that would have them violate the Constitution or not. Your Honor, I don't believe the principle of qualified immunity requires an appellate decision that says this thing is unconstitutional. When you're talking about broad – you're right. But when you're talking about broad principles, it does, I think. But maybe I'm completely wrong. Sure. So the broad principle here is that a trier of fact can find deliberate indifference. That means that action could rise to the level of – Right. And also could not. Right. But I don't believe that that's the way this Court has interpreted those opinions. Okay. I think that that – I don't believe that there's a case that has so far held that an appellate opinion establishing a broad principle needs to say a thing is unconstitutional as opposed to just remanding for further findings. And then there's also Thomas against the tone of Davey, which says, we have held that failure to provide prompt attention to serious medical needs by delaying necessary medical treatment for nonmedical reasons shows deliberate indifference. So that one, I think, takes care of Your Honor's question, that it does show as opposed to a jury confinement. It raises other issues, but thank you. I appreciate it. Okay. Very well. Thank you so much. Thank you, Your Honor. Well argued on both sides. That case is submitted and the Court will be in recess until tomorrow morning at 9 a.m. All rise.